# EXHIBIT A

Filed
File Date: 4/3/2026 4:50 PM
Strafford Superior Court
E-Filed Document

STATE OF NEW HAMPSHIRE

STRAFFORD, SS.                                                     SUPERIOR COURT

Ms. Donna Moulton
34 Pleasant Valley Road
Middleton, NH 03887

v.

Credit Control Services, Inc.
d/b/a Credit Collection Services
725 Canton Street
Norwood, MA 02062
(NH Location: 175 Commerce Way, Portsmouth, New Hampshire 03801)

Docket No. 219-2026-CV-00188

## COMPLAINT AND REQUEST FOR JURY TRIAL

NOW COMES, Donna Moulton, Plaintiff, by and through her attorney, Law Office of

Leslie H. Johnson, PLLC, and complains against Credit Control Services, Inc., d/b/a Credit

Collection Services, and Enterprise Associates, LLC, Defendant, and in support thereof states as

follows:

### INTRODUCTION

### PLAINTIFF REQUESTS TRIAL BY JURY

1.      Plaintiff, Donna Moulton, brings this action pursuant to the statutory and common

laws of the State of New Hampshire and the United States, particularly the New Hampshire

common law, laws against discrimination including the Americans with Disabilities Act (ADA),

42 U.S.C. §12101 *et seq*., as amended (ADAAA, referred to herein as the "ADA"); the Age

Discrimination in Employment Act (ADEA, 29 U.S.C.  §§ 621 et. seq.), and Title VII, for

discrimination and retaliation on the basis of disability (failure to accommodate), age and gender,

including an intersection of those categories. Plaintiff also makes claims under the FMLA for

interference and retaliation due to Plaintiff's FMLA requests and approval of leave, and under

1

This is a Service Document For Case: 219-2026-CV-00188
Strafford Superior Court
4/21/2026 9:18 AM

the NH common law for wrongful discharge.  Plaintiff seeks to recover all damages as allowed by law, and all equitable relief to which she is entitled.

**PARTIES**

2.     Ms. Donna Moulton (hereinafter, "Ms. Moulton" or "Plaintiff"), is a resident of Middleton, Strafford County, New Hampshire, and was employed by Defendant Credit Control Services, Inc., d/b/a Credit Collection Services from on or about August 31, 2021 to May 10, 2023.  Ms. Moulton always performed her job well.

3.     Credit Control Services, Inc., d/b/a Credit Collection Services (hereinafter referred to as "CCS" or "Defendant") is a foreign corporation registered to do business in New Hampshire, with a principal address of 725 Canton Street, Norwood, MA 02062. Defendant's registered agent is CT Corporation System, 2 1/2 Beacon Street, Concord, NH 03301.

4.     Under the theories of *respondent superior* and/or vicarious liability Defendant is responsible for all actions and failures to act of its employees, named or unnamed herein, who all times were acting within the scope of their employment, as well as for their own actions and failures to act.

**JURISDICTION & VENUE**

5.     Venue and jurisdiction are proper because Plaintiff worked for Defendant in a hybrid position from her home in Middleton, Strafford County, New Hampshire, and at Defendant' location at 175 Commerce Way, Portsmouth, New Hampshire 03801, and the unlawful employment acts complained of were committed in both Strafford and Rockingham Counties.

6.     Ms. Moulton filed a Charge of Discrimination with the New Hampshire Commission for Human Rights ("NHCHR"), within 180 days of the last discriminatory act.

(EDAG(R) 0016-24 / 16D-2023-00280). On January 5, 2026, the EEOC issued a Notice of Right to Sue, and this Complaint is filed within 90 days of receipt thereof, and well within three years of the last discriminatory act.

### STATEMENT OF FACTS

7.    Ms. Moulton is female, and a person with disabilities who is entitled to protection under the ADA, as amended (ADAAA, herein collectively "ADA"). Ms. Moulton disclosed her disability, anxiety, to Defendant.

8.    Defendant is believed to have 50 or more employees within a 75-mile radius of Ms. Moulton's work location.

9.    Plaintiff was age 60 at the time of her termination.

10.    On or about August 30, 2021, Ms. Moulton was hired as an Arbitration Specialist by Defendant with Ms. N. Robinson as her direct supervisor. Ms. Moulton had no previous experience in this role and was told she would be properly trained. After working for Defendant approximately three months, she was able to work remotely from home and was told by N. Robinson, that her position was hybrid, meaning she would work from home and the office.

11.    There were two types of files assigned to Arbitration Specialists, (1) applicant files, and (2) respondent files. To the best of her knowledge and belief only Ms. Moulton and Craig Holland, a male approximately 30 years old, were assigned applicant files, the remaining Arbitration Specialists worked on respondent files.  Applicant files took longer to process than respondent files.

12.    Therefore, Ms. Moulton asked N. Robinson if Defendant would reduce the filing rate on applicant files due to the increased time it took to process those types of files; however,

3

her request was denied by Heather Hale, Director of Operations. Therefore Ms. Moulton and Mr. Holland were held to a higher standard than the other Arbitration Specialists.

13.    In addition, Defendant changed its policy on file rates. It used to be if an Arbitration Specialist reviewed a file and discovered it did not have all the documents needed to fully process the file, the Specialist still got credit for the file, i.e. part of their file rate. The file was then placed in pending status while the Specialist awaited the needed documents. However, the policy changed, meaning a Specialist could open a file and spend 15-30 minutes on it before knowing documents were missing. If the needed documents were not present, they would not get credit for working on the file until the documents were received. Thus, Ms. Moulton's file rate suffered since Applicant files were much more often missing information or documents than Respondent files.

14.    In or around November 2021, Ms. Hale offered to help Ms. Moulton with training, not because of any performance issues, but because Quality Assurance (hereinafter "QA") was way behind on their work and had not had the proper amount of time to train Ms. Moulton.

15.    Ms. Moulton received weekly training sessions with Ms. Hale over video/Webex; however, the training only addressed issues Ms. Moulton ran into each week. There was no training by Ms. Hale on how to file faster, how to do monthly reports etc. Thus, Ms. Moulton's filing rate suffered.

16.    On or about January 3, 2022, Ms. Moulton became fully remote. As far as she was aware she was doing well, as she had received no negative feedback.

17.    In July 2022, Ms. Moulton's mother was hospitalized and in August 2022 she was placed on hospice. Defendant was fully aware of the situation. During that time Ms. Moulton

4

continued to work full-time and was able to split her time between work and caring for her mother, because while working remotely, she was only 10 minutes from her mother.

18. Therefore, on or about August 31, 2022, Ms. Moulton applied for and was approved for intermittent FMLA from August 31, 2022, until October 15, 2022, to assist her ailing mother when needed. Ultimately, Ms. Moulton only used approximately 12 hours of FMLA time.

19. Around the end of August 2022, Ms. Moulton received her mid-year review, from her supervisor N. Robinson, which was positive. It showed she was exceeding expectations in some areas, and meeting expectations in most other areas. It did note she was behind schedule in a few areas, but that it was because of the large turnover and the unorthodox lack of training she experienced.

20. On or about September 21, 2022, just three weeks after her positive review, Defendant asked Ms. Moulton to return to the office full-time for further training and because she allegedly was not meeting her goals.  Ms. Moulton did not understand the sudden push to go faster, especially since she had successfully completed over 200 files that had been sitting and waiting for QA's approval for over a year and thus had expired. When Defendant called Ms. Moulton back into the office she asked for a reasonable accommodation to work remotely which was rejected.

21. Additionally, throughout 2022, N. Robinson repeatedly instructed Ms. Moulton to redo files originally assigned to other employees in order to reduce the overall backlog, which included Mr. Holland's files. It is unclear why Defendant would assign or continue to assign this role to Ms. Moulton if they genuinely believed she was failing to meet performance goals.

Therefore, Ms. Moulton was understandably confused and frustrated by the subsequent requirement to return to the office.

22. Ms. Moulton returned to the office on September 26, 2022, which was also D. Grissom's first day as supervisor. Ms. Moulton was looking forward to working with D. Grissom, as she believed the promised training would occur. However, the training did not come, as only one training class was held.

23. On September 26, 2022, Ms. Moulton emailed D. Grissom to request reinstatement to remote work as soon as possible so that she could assist her mother with her care needs. In the email, Ms. Moulton explained the importance of working from home for this purpose. As a compromise, Ms. Moulton proposed splitting each day in which she would work in the office every morning and from home every afternoon.

24. The request was denied even though another co-worker was permitted to work from home to care for her disabled child. Defendant was fully equipped for their employees to work remotely, including employee training for remote functionality. This denial caused a lot of stress for Ms. Moulton and remote work was not a hardship, undue or otherwise, to Defendant.

25. Ms. Moulton soon took notice of D. Grissom's favoritism towards male employees. For example, whenever D. Grissom gave instructions, she would joke with Ms. Moulton's male coworkers but not with her; she would flirt with the men; some days she would dress in low cut outfits.

26. Also, D. Grissom began reviewing Ms. Moulton's files and taking credit away if she found anything that purportedly did not meet her expectations. This was based solely on D. Grissom's opinion, not company policy.

27.     On or about November 14, 2022, Ms. Moulton questioned D. Grissom's decisions during a meeting with her and Ms. Hale and was told that "arbitration is a gray area." Meaning D. Grissom's opinion that a file had errors or wasn't "good enough" was at times nothing more than her opinion. Thus, needlessly bringing Ms. Moulton's file rate down.

28.     D. Grissom would inform Ms. Moulton that the balances were incorrect on some of her files. However, when Ms. Moulton reviewed those files, she discovered they were medical files. Defendant's policy for medical files was for the Arbitration Specialist to not concern themselves with the medical balance until the property damage portion of the file was resolved. Therefore, those balances should never have been taken into account. It appeared to Ms. Moulton that D. Grissom was trying to find ways to reduce Ms. Moulton's file rate.

29.     Ms. Moulton's mother died on October 15, 2022, and on or about October 17, 2022, Ms. Moulton used her PTO and took the following week off for bereavement, returning to work on October 24, 2022.

30.     Upon her return to work, Ms. Moulton found her email full of negative feedback from D. Grissom. It appeared that while Ms. Moulton was out of the office, D. Grissom took it upon herself to review most of Ms. Moulton's files beginning when she first started working for Defendant. D. Grissom sent Ms. Moulton approximately 20 emails, pointing out what was purportedly wrong with each file, even though these files were old and during a time Ms. Moulton was first learning her job and not properly trained. D. Grissom began micromanaging Ms. Moulton, causing unnecessary stress. D. Grissom told Ms. Moulton if she was clocked in, she needed to perform her duties 100% of the time or clock out. Ms. Moulton felt like D. Grissom was trying to get Ms. Moulton to clock out so she would get in trouble and cause her to receive an attendance occurrence.

31.     Ms. Moulton felt overwhelmed and believed D. Grissom was targeting her because she took time off due to her mother's health and passing, and because Ms. Moulton is female.

32.     Because of the content of these emails, Ms. Moulton suffered a panic attack. She called her doctor to ask for direction; however, she was unable to take the medication her doctor prescribed for panic attacks during work as it would affect her ability to drive home.

33.     That same day, Ms. Moulton spoke to C. Hulburt and S. Parisien, both in the Human Resources Department, about the stress D. Grissom was causing her. Ms. Moulton had many conversations with S. Parisien, S. Lange, and C. Hulburt. Ms. Moulton expressed her concerns with D. Grissom's inappropriate conduct toward her. Ms. Moulton told them she felt D. Grissom was placing her under a microscope.

34.     On October 26, 2022, Ms. Moulton found out from T. Segee, QA that D. Grissom was planning to put her on a PIP ("Personal Improvement Plan"). This was only two days after Ms. Moulton had returned from bereavement leave after losing her mother.  This constituted retaliation for applying for and taking FMLA time with the purpose to interfere therewith.

35.     Even though by November 14, 2022, Ms. Moulton had reached an average filing rate of 5.5 with an expectation rate of 6, Ms. Moulton was placed on a PIP. This caused another panic attack and Ms. Moulton had to leave work. Additionally, from the very first day she returned to the office, she was consistently told all she had to do is show steady improvement. When she successfully did so, Defendant started purportedly finding other problems with her files, with the purpose of decreasing her file rate.

36.     Upon leaving work one day, Ms. Moulton went to see her medical care provider who recommended she take a leave of absence due to her disability which was being aggravated

by work. Therefore, she applied for FMLA which was approved for the time period covering November 14, 2022, through January 29, 2023. During her leave of absence Ms. Moulton sought mental health counseling and was ultimately released to return to work on January 30, 2023.

37.     On or about January 30, 2023, upon her return to work, Ms. Moulton asked HR for a reasonable accommodation to work from home, and provided a doctor's note dated January 23, 2023, which requested she be allowed to work from home during inclement weather based on her anxiety. The note also stated she should be allowed to work from home if her anxiety was exacerbated, which was being caused by the hostile environment and mistreatment at work. HR denied the part of her reasonable accommodation which would have allowed her to work from home. Therefore, if Ms. Moulton suffered from anxiety either due to inclement weather or from work-induced anxiety, she was not allowed to work from home, instead she could leave the office, but receive no pay for the missed days and/or hours. Not only did this mean a reduction in her pay, but it would negatively affect her file rate.

38.     Therefore, Ms. Moulton did her best to work even while suffering from anxiety, due to inclement weather and panic attacks at work, all to her detriment.

39.     In addition, after a three-months' absence, Ms. Moulton struggled to readjust her filing duties with minimal training and support.

40.     During her PIP, D. Grissom was supposed to work out of the same office and during the same times as Ms. Moulton so she could provide additional training and support. However, all D. Grissom did the first week of her PIP was call Ms. Moulton each morning to touch base. Otherwise, she walked by, said hi to Ms. Moulton, and talked about Ms. Grissom's daughter. In fact, the only instruction Ms. Moulton was given by D. Grissom was to "file, file, file" and "don't talk to anyone, just file". That was not training, it was only unnecessary

9

pressure, which D. Grissom knew, or should have known, would increase the possibility of another panic attack.

41.    Ms. Moulton received no training on returning files to the Third-Party Carrier per policy, and contends the PIP lacked reasonable accommodations for her performance challenges related to her disability, and constituted discriminatory and retaliatory treatment.

42.    Within days of Ms. Moulton returning to work, D. Grissom gave her a yearly review. Even though Ms. Moulton was believed to be the top collector for 2022 in the department, D. Grissom gave her a bad review. In fact, D. Grissom checked off "needs development" under every category, including collection goal, which Ms. Moulton had exceled in. This constituted discrimination and retaliation against Ms. Moulton.

43.    During her 2nd week on the PIP, the only training Ms. Moulton received from D. Grissom was for approximately 15 minutes, showing her how to search and move documents in batches vs. one at a time, most of the other times they met Ms. Grissom talked about her daughter instead of providing training.

44.    No additional training was given by D. Grissom and no meetings occurred at the end of each week, as had been promised.  D. Grissom came in to work late and left early. This was very frustrating as Ms. Moulton had been promised the training, wanted to continue to excel at her job, and was given no reasonable chance to meet additional purported requirements.

45.    The only other training Ms. Moulton received was from T. Segee in QA, who, although the training was set for the entire day, due to the numerous interruptions that Ms. Segee had to take care of, Ms. Moulton only received approximately 2 hours of actual training. In addition, the training she did receive consisted of working on Ms. Moulton's "easy" files, not the files that needed document requests, which is what Ms. Moulton was told she needed training in.

Therefore, she learned very little and what she did learn did not assist her with completing files faster.

46. During the fourth week on her PIP, Ms. Moulton contracted Covid, which she believes was from D. Grissom. This terrified Ms. Moulton because she has diabetes and a family member of hers with diabetes had died from Covid.

47. While out for covid, Ms. Moulton was told by D. Grissom that she could work from home, however, she had to make up at least one hour each workday she could not work because of being sick. D. Grissom stated if Ms. Moulton did not work at least one hour out of each 8-hour workday, she would receive an attendance occurrence.  Ms. Moulton believed this was against company policy which stated that attendance incidents would not be incurred for absences due to Covid. In addition, D. Grissom told Ms. Moulton she was not allowed to work Saturday to make up her lost time.

48. Although D. Grissom later claimed Ms. Moulton struggled because she was working from home, the reality was Ms. Moulton struggled because she was sick with Covid. Due to her fear of receiving an attendance occurrence while on a PIP, Ms. Moulton worked all, or almost all days, for the full 8 hours even though she was very sick.

49. From January 30, 2023 to March 10, 2023, Ms. Moulton continued to work hard to succeed. The PIP required Defendant to provide weekly meetings and feedback to Ms. Moulton as to what she was purportedly doing wrong and tips for being even more successful. However, Defendant failed to keep up their end of the PIP, which could also be taken to mean Ms. Moulton's performance was perfectly fine.

11

50.     On or about February 27, 2023, after recovering from Covid, Ms. Moulton returned to the office until March 10, 2023. Ms. Moulton was then told that she passed the PIP and could work exclusively from home starting March 13, 2023.

51.     From March 13, 2023 to April 7, 2023, Ms. Moulton received positive feedback.

52.     During the week of April 3, 2023, Ms. Moulton expressed her concern to D. Grissom about the number of emails in her inbox. D. Grissom stated that Ms. Moulton should not worry about it because D. Grissom and T. Segee were aware and were going to help.

53.     In the beginning of April 2023, D. Grissom sent Mr. Holland and Ms. Moulton an email with a list of files for diagram requests. At the time Mr. Holland had 35 and Ms. Moulton had 39 diagram request files. However, D. Grissom would not allow any downtime to go through the list, making it impossible for Ms. Moulton to meet her file rate.

54.     This backlog of diagram requests was due to no fault of Ms. Moulton, but instead because D. Grissom had instructed her to stop requesting diagrams unless absolutely necessary, as the Client Services Department was behind.

55.     D. Grissom again started micromanaging Ms. Moulton and setting her up for failure, including but not limited to:

a.     Bombarding Ms. Moulton with multiple emails.

b.     Instructing Ms. Moulton to only check her emails at the end of the day, while at the same time sending Ms. Moulton high-priority emails to address. And when Ms. Moulton responded to the high-priority emails, D. Grissom would reprimand her because she did. This also was non-sensical because D. Grissom knew Ms. Moulton had to access her emails throughout the day in order to perform her job.

12

c.      D. Grissom would "footprint" Ms. Moulton's computer, which meant she would watch Ms. Moulton's activity in real time. This was extremely intrusive and caused additional micromanagement by D. Grissom, examples of which include, but are not limited to:

(1)      Ms. Moulton kept a list of files to email to her supervisor at the end of the day due to D. Grissom's earlier directive; however, D. Grissom would call and ask Ms. Moulton why a certain note was in a file when D. Grissom has not received email. The only way D. Grissom would know this was by watching Ms. Moulton's activity.

(2)      One time Ms. Moulton forgot to mark the contentions field as completed; D. Grissom told her she would do it for her, however D. Grissom failed to do so, and then reprimanded Ms. Moulton for D. Grissom's error.

(3)      Ms. Moulton requested a file closure because the client was not pursuing the claim. D. Grissom told Ms. Moulton she couldn't find anywhere in the file where it said that. Ms. Moulton had to stop what she was doing to find it for her.

(4)      A client requested a police report so Ms. Moulton emailed it to them; however, the client was unable to locate it. Therefore, the client requested it from Ms. Moulton a second time. Instead of D. Grissom asking Ms. Moulton if she had taken care of issue, she forwarded her an email filled with exclamation points demanding Ms. Moulton take care of it.  Ms. Moulton felt, and was, unnecessarily harassed.

(5)      D. Grissom would go through Ms. Moulton's emails and "organize" them to her own preferences, which included deleting items Ms. Moulton was keeping for reference, including weekly reports. This made it so Ms. Moulton could not locate her folders and was unable to find emails she needed. These unnecessary and

13

disruptive actions by D. Grissom only caused more work for Ms. Moulton and slowed down her file rate.

56.     Ms. Moulton felt she could not do anything to please D. Grissom and that she was being set up for failure. D. Grissom buried Ms. Moulton in work other than filing and made it impossible for her to succeed with no downtime. Despite trying to keep up, at the end of the week D. Grissom told Ms. Moulton that she was behind on emails and diagrams. This retaliation and harassment created additional stress that exacerbated Ms. Moulton's disability.

57.     On or about April 19, 2023, D. Grissom called Ms. Moulton and asked about her downtime. This question had never been asked in the middle of the week before. Ms. Moulton told her how much downtime she had so far and that she was trying to catch up with the emails and diagrams and planned to concentrate on catching up with her filing once she was done. Ms. Moulton felt it was extremely hard to get anything done with D. Grissom micromanaging her.

58.     D. Grissom told Ms. Moulton there was no way Ms. Moulton was going to meet her filing rate and that she needed to return to the office with her computer equipment.

59.     Ms. Moulton was not able to properly meet her filing rate because of other diagram requests (and the previously stated harassment/micromanagement). These diagram requests were very time-consuming and made it impossible to meet the filing rate without downtime. More emails were created when they reviewed and submitted her files. It was clear to Ms. Moulton that D. Grissom wanted to fire her and was setting her up for same.

60.     On April 21, 2023, Ms. Moulton returned to the office and was given a final write-up. This meant Ms. Moulton was no longer eligible to transfer to another department, and if she did not meet her goals she would be terminated. Ms. Moulton was told that going forward she would be an in-office associate.

61. Thereafter, Ms. Moulton noticed she was not getting enough new files each day to meet her file rate requirement. The files she was receiving contained either medical files or files missing documents which took longer to process; one of them having over 2400 pages to review. It was apparent to Ms. Moulton that Defendant was setting her up to claim she failed.

62. On April 24, 2023, Ms. Moulton emailed S. Parisien, telling her she had no chance to succeed in the Arbitration Department due to the final write-up. Ms. Moulton, S. Parisien and S. Lange met via zoom later that day.

63. To the best of Ms. Moulton's belief Defendant never investigated any of her complaints.

64. Ms. Moulton also asked for a reasonable accommodation to work from home due to her disability, but she was denied by S. Parisen and S. Lange. Therefore, Ms. Moulton filed for intermittent FMLA covering the period of April 25, 2023 through October 24, 2023 which was approved on May 3, 2023, which Ms. Moulton learned the next day.

65. From April 24, 2023, until her termination on May 10, 2023, Ms. Moulton was the only Arbitration Specialist who had to go into the office every day. Even Mr. Holland, who did not meet his filing rate, was allowed to work remotely, while others were only required to be in the office on Tuesdays and Thursdays. Ms. Moulton believes this was because she was being retaliated against due to her disability and gender, and to interfere with her reasonable accommodation request and use of FMLA.

66. On May 10, 2023, just a week after being approved for FMLA, S. Lange asked Ms. Moulton to grab her things and follow him to his office where D. Grissom and Ms. Hale were present. Defendant fired Ms. Moulton for purportedly not meeting the filing rate and other expectations.

67.     As stated above, Defendant made it impossible for Ms. Moulton to meet the filing rate, not only due to D. Grissom's micromanagement but also because she was only assigned to applicant files, and she was only being forwarded 4 or 5 files per day when they demanded a daily file rate of 7.5. In addition, Defendant expected her to handle back-log emails from QA, that they knew would cause her to not meet her file rate, and Defendant failed to train her properly. Defendant set Ms. Moulton up to fail through their retaliation and discrimination, which is described throughout this Complaint.

68.     Although Ms. Moulton had emailed and/or called HR many times when she was harassed by D. Grissom, Defendant took no action to help, nor did it appear they investigated.

69.     While Defendant had approved an intermittent FMLA for her disability, and given her a reasonable accommodation, it continued to retaliate against her for same. D. Grissom refused to talk with Ms. Moulton about her disability and her need for an accommodation, instead directing her to contact HR.

70.     Additionally, D. Grissom treated the male, and younger, Arbitration Specialist (Mr. Holland) differently than Ms. Moulton. D. Grissom ignored Ms. Moulton, including failing to train her. In comparison, she would joke around with her male counterparts, and after Ms. Moulton was terminated Mr. Holland was promoted even though he was also struggling to meet the file rate.

71.     Both Mr. Holland and Mr. L. Ambrosio were cross-trained so they could process files quicker, while Defendant refused to train, or cross-train, Ms. Moulton. Since Ms. Moulton's termination, it is believed D. Grissom hired two more male Arbitration Specialists.

72.     Defendant refused Ms. Moulton's reasonable accommodation request and discriminated against her because of her disability and gender, as well as retaliated against her

16

for complaining and seeking FMLA, and/or a reasonable accommodation.

73.    Ms. Moulton also claims that she was discriminated against and retaliated against based on the intersection of her protected categories, disability, gender and age.

74.    Ms. Moulton also claims that each of the protected categories she was in, disability, gender, and age were singly or together "a but for" reason for the harassment, discrimination and retaliation.

75.    Defendant knew, or should have known, that their actions described herein were illegal. Defendant's actions were contrary to the law, egregious, and done knowingly, maliciously, willfully, wantonly, and with reckless indifference and were willful, egregious and wanton, thus justifying an award of enhanced/liberal compensatory damages and punitive damages.

76.    Defendant's discrimination and retaliation directed towards Ms. Moulton has caused her damages, including but not limited to liberal/enhanced compensatory damages, punitive damages, unpaid wages, lost wages and benefits (past and future), damages for emotional distress, embarrassment, humiliation, aggravation, loss of reputation, attorney fees, costs, all pre-judgment interest, and an amount to compensate for any negative tax consequences that result from any judgment or decision.

77.    Ms. Moulton claims all damages allowed to her by law, and all equitable relief to which she may be entitled including, but not limited to, training of upper management on the anti-discrimination laws and FMLA.

17

## COUNT I
## DISABILITY DISCRIMINATION/ FAILURE TO ACCOMMODATE, INCLUDING TERMINATION
## THE AMERICANS WITH DISABILITIES ACT, AS AMENDED (ADAAA)

78.    Ms. Moulton incorporates herein each and every allegation raised elsewhere in the Complaint as if fully set forth herein, and further states as follows:

79.    Ms. Moulton believes, and asserts, that she was discriminated against and retaliated against, and her position terminated due to her disability, record of disability, or perceived disability, and that she easily could have been accommodated by Defendant as requested, to work remote while experiencing periods of extreme anxiety from harassment by management.  This accommodation was reasonable and no hardship to Defendant, undue or otherwise.

80.    Ms. Moulton's anxiety, and underlying health conditions, constitute disabilities within the meaning of the ADA, for which she was entitled to reasonable accommodations.

81.    As described above, Defendant discriminated against Ms. Moulton by refusing to grant her reasonable accommodations, including when she requested same on or about January 30, 2023, and on or about April 23, 2023. (See par. 37, 41, and 64).

82.    Defendant failed to enter into a meaningful interactive process with Ms. Moulton, failing even to have had her fill out an ADA form from her medical providers, before denying her requests.

83.    Defendant could have granted Ms. Moulton the reasonable accommodation of working remotely during periods of high anxiety, particularly as they were caused by discrimination and harassment of her supervisors. Alternatively, or in addition, Defendant could have investigated the claims of harassment, and demand that they cease.

18

84.     Allowing Ms. Moulton to work remotely, which she did for extended periods of time, just like others she worked with, was not any hardship to Defendant, and certainly not an "undue hardship".

85.     Once an employee, such as Ms. Moulton, requests a reasonable accommodation for her disability, Defendant must grant it unless to do so would create an undue hardship to its overall business operations.

86.     Instead of entering the interactive process, accessing any undue hardship, and granting the reasonable accommodations, Defendant discriminated against her by terminating her.

87.     Ms. Moulton asserts that the treatment she received was impermissible disability discrimination, as described herein, and Defendant's failure to enter into a meaningful interactive process to accommodate her, instead terminating her, was contrary to the ADA.

88.     As a result of Defendant's disability discrimination perpetrated towards Ms. Moulton, she has suffered damages as set forth elsewhere herein, and claims all damages as allowed by law.

89.     Ms. Moulton also claims all equitable relief to which she may be entitled.

## COUNT II
## AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12101 et seq.), AS AMENDED (ADAAA) RETALIATION

90.     Ms. Moulton incorporates herein each and every allegation raised elsewhere in the Complaint as if fully set forth herein and further states as follows:

91.     The retaliation is described elsewhere herein, and includes that Defendant retaliated against Ms. Moulton for exercising her rights under the ADA by requesting reasonable accommodations, which included taking away her ability to work remotely like others did, and

19

then terminating her, which all was contrary to the ADA.

92.    As a result of Defendant's disability discrimination and retaliation perpetrated towards Ms. Moulton, she has suffered damages as set forth elsewhere herein, and claims all damages as allowed by law.

93.    Ms. Moulton also claims all equitable relief to which she may be entitled.

**COUNT III**
**AGE DISCRIMINTION IN EMPOLOYMENT ACT**
(ADEA, 29 U.S.C.  §§ 621 et. seq.)

94.    Ms. Moulton incorporates herein each and every allegation raised elsewhere in the Complaint as if fully set forth herein and further states as follows:

95.    Ms. Moulton's coworkers included the following: C. Holland (male, in 30's); females Donna E. (was in 60's); Tammi (40's or 50's); Rebecca (late 20's/early 30's); Leandro (male 30-35); and there was a 2oman who worked from home in her 40's.

96.    Donna was micromanaged like Ms. Moulton and quit, but the others are believed to have not been micro-managed and allowed to work from home regularly.

97.    As a result of Defendant's age discrimination perpetrated towards Ms. Moulton, she has suffered damages as set forth elsewhere herein, and claims all damages as allowed by law.

98.    Ms. Moulton also claims all equitable relief to which she may be entitled.

**COUNT IV**
**GENDER DISCRIMINATION**
**TITLE VII (42 USC sec. 2000e et seq.)**

99.    Ms. Moulton incorporates herein each and every allegation raised elsewhere in the Complaint as if fully set forth herein, and further states as follows:

100.    Defendant treated male employees differently than female employees, including

20

that supervisor D. Grissom was friendlier to the male employees, preferred hiring male employees and treated them more favorably by giving them better opportunities and training, which is believed to continue after Ms. Moulton's termination, held them to lower performance standards, did not harass them, and allowed them to work remotely.

101.    Ms. Moulton asserts that the treatment she received, as described herein, including her termination, was at least partially because of her gender, female, and was in violation of Title VII.

102.    As a result of Defendant's gender discrimination perpetrated towards Ms. Moulton, she has suffered damages as set forth elsewhere herein, and claims all damages as allowed by law.

103.    Ms. Moulton also claims all equitable relief to which she may be entitled.

**COUNT V**
**FAMILY AND MEDICAL LEAVE ACT (29 U.S.C. § 2601 et seq.)**
**FMLA INTERFERENCE AND RETALIATION**

104.    Ms. Moulton incorporates herein each and every allegation raised elsewhere in the Complaint as if fully set forth herein and further states as follows:

105.    At all relevant times, Ms. Moulton was eligible for leave under the Family and Medical Leave Act (FMLA), and Defendant was a covered employer under the FMLA.

106.    Ms. Moulton provided adequate notice to Defendant of her need for intermittent leave to care for her mother, which was granted.  However, on or about September 21, 2022, Defendant effectively revoked the leave based both on discriminatory and retaliatory reasons for requesting and taking the leave, thus interfering with Ms. Moulton's exercise of her FMLA rights, and retaliating against her therefore.

107.    Furthermore, Defendant failed to properly train its supervisors to respond to

21

FMLA-related disclosures and the requirements to be observed in FMLA leave situations, thereby denying her the substantive rights guaranteed by the FMLA, including to be free from retaliation for exercising leave rights.

108. Defendant's actions constitute unlawful interference with, restraint of, denial of, and retaliation for Ms. Moulton's FMLA leave as it existed, and prospectively, in violation of 29 U.S.C. § 2615(a)(1)(2).

109. As a result of Defendant's FMLA interference and retaliation perpetrated on Ms. Moulton, she has suffered damages as set forth elsewhere herein, and claims all damages as allowed by law.

110. Ms. Moulton also claims all equitable relief to which she may be entitled.

## COUNT VI
## WRONGFUL DISCHARGE

111. Ms. Moulton incorporates herein each and every allegation raised elsewhere in the Complaint as if fully set forth herein and further states as follows:

112. At all relevant times, Ms. Moulton was employed by Defendant and performed her job duties in a satisfactory manner.

113. Ms. Moulton was wrongfully discharged based on her gender, age, disability, and FMLA leave requests for herself and to care for her dying mother.

114. Ms. Moulton's requests for FMLA leave, reasonable accommodations, and complaining about the treatment she received due to her protected characteristics qualify as actions in furtherance of public policies.

115. Ms. Moulton was fired because of these actions in furtherance of public policies.

116. Defendant's actions in harassing, retaliating against her and firing her was intentional, malicious, willful, done with deliberate indifference, knowing, oppressive, wanton,

22

reckless, and negligent and/or grossly negligent.

117.    Defendant's termination of Ms. Moulton constitutes a wrongful discharge.

118.    As a result of Defendant's wrongful discharge of Ms. Moulton she has suffered damages as set forth elsewhere herein, and claims all damages as allowed by law.

119.    Ms. Moulton also claims all equitable relief to which she may be entitled.

WHEREFORE Plaintiff, Ms. Moulton, respectfully prays this Honorable Court, and/or a jury, order the following relief against Defendant, as requested above:

A.    Back wages, together with lost fringe benefits and any other benefits, including increased retirement benefits, which Plaintiff would have earned had she not been terminated;

B.    Future wages, fringe benefits, loss of earning capacity and other benefits;

C.    Compensatory damages;

D.    Enhanced/liberal compensatory damages;

E.    Punitive damages;

F.    Liquidated damages for lost wages, including up to twice the amount of lost wages;

G.    All damages which are available under the above-cited laws;

H.    An amount to be awarded by the Court to make up for any adverse tax consequences due to any judgment or award;

I.    All available pre-judgment and post-judgment interest, including on attorneys' fees and costs, which will be accruing throughout the case;

J.    Reasonable attorneys' fees, interest and costs;

K.    All equitable relief which may be available, and any other appropriate relief; and,

L.    Such other and further relief as is just and equitable.

Respectfully submitted,
**DONNA MOULTON, Plaintiff**
By her attorney


Dated: April 3, 2026                             /s/ LESLIE H. JOHNSON
Leslie H. Johnson, Esquire - #5545
LAW OFFICE OF LESLIE H. JOHNSON, PLLC
PO Box 265
Center Sandwich NH 03227
603.284.6600
leslie@lesliejohnsonlaw.com

24